## SNAPP HOTEL & REALTY CO. v. ELBERT et al.

### No. 11456.

Circuit Court of Appeals, Eighth Circuit.

Jan. 8, 1940.

Clay C. Rogers, of Kansas City, Mo. (O. C. Mosman and C. Jasper Bell, both of Kansas City, Mo., on the brief), for appellant.

Maurice J. O'Sullivan, of Kansas City, Mo. (J. Francis O'Sullivan, John M. P. Miller, and O. H. Stevens, all of Kansas City, Mo., on the brief) for appellees.

Before THOMAS and VAN VALKENBURGH, Circuit Judges, and DEWEY, District Judge.

VAN VALKENBURGH, Circuit Judge.

This appeal is from judgments rendered against appellant in two consolidated cases: One, by appellee Ruby Elbert, to recover damages for personal injuries sustained when she fell on the floor of the Turkish Bathroom operated by appellant in its hotel building at Excelsior Springs, Missouri; and the other, by her husband, appellee Herbert S. Elbert, for loss of con-

sortium, doctor's bills and medical expenses resulting from said injuries to his wife. At the trial a jury was waived and the court, making findings of fact as a basis for conclusions of law, rendered judgment in favor of appellee, Ruby Elbert, in the sum of $5,000, and in favor of the husband in the sum of $2,500.

September 21, 1935, Mrs. Elbert, then a guest at the Snapp Hotel, went to the Turkish Bathrooms in the basement of the hotel building for the purpose of obtaining a hot sulphur bath. From the record it appears that in a room provided for that purpose she disrobed and was summoned to an individual bathroom where she was placed in a hot bath of saline sulphur water by one of the attendants, a servant of appellant. She remained in this bath for a period variously stated as ten or twelve minutes. At the end of that period she was assisted from the bath-tub and a sheet was placed about her body by the attendant, who then guided her to the door of this bathroom. The attendant then preceded her to another room, about six feet farther on, which contained a table or slab upon which Mrs. Elbert was to receive a salt and soap rub as a completion of her bath. Proceeding alone, after the attendant left her, Mrs. Elbert fell and sustained the injuries for which these recoveries are sought.

The door of the smaller bathroom or booth in which Mrs. Elbert received the hot saline bath, and that of the room in which she was to receive the salt and soap rub, to which she was proceeding when she fell, are approximately six feet apart and situated on the same side of a central room of the bath house. This central room slopes slightly toward its center, where a drain is situated. The floor covering of this room is described as asphalt tile or composition tile, which has "non-slip characteristics". In order to pass from her tub-room to the salt-slab room, it was necessary for Mrs. Elbert to pass through the door of the former and along and upon the floor of this central room for a distance of about six feet. She testifies that, after she had been for about twelve minutes in the tub of hot mineral water, she summoned Mrs. Marie Warner, her attendant, who assisted her from the tub, placed a sheet about her, falling from the shoulder, and guided her to the door of the room by placing one hand under and another over Mrs. Elbert's arm about at the elbow. Arriving at the door, the attendant released appellant's arm and went forward to prepare the slab room. Mrs. Elbert says she was not conscious of the fact that her arm had been released, took two and perhaps three steps forward over the floor of the central room toward the slab room, when her feet slipped from beneath her and she fell heavily, injuring her left arm and shoulder. She testifies that the floor was wet and that there was nothing upon it at that point, such as cloth, rubber, or other like substance, to prevent slipping; that she had taken baths in this hotel over a period of several years; that floor coverings such as sheets had always been provided, and that the attendant had always assisted her from the tub-booth to the salt slab; that one coming out of a hot water bath was inclined to feel a little weak; that she was not conscious at the moment that the attendant had released her arm, and that she continued automatically to walk toward the slab room, and almost immediately slipped and fell.

Mrs. Warner, the attendant, testified that she prepared the bath for Mrs. Elbert, that she noted the time carefully, and, at the end of ten minutes, told Mrs. Elbert that it was time to get up. She assisted her from the tub and placed the sheet about her in the usual manner; it touched the floor, and she warned Mrs. Elbert to "watch and don't trip on your sheet". She says she started to guide Mrs. Elbert out of the little room; she had her hands on each side of Mrs. Elbert's back, but released her at the door of the tub-room because she wanted to go on ahead to prepare the salt slab; that there were sheets on the floor of the outer central room over which Mrs. Elbert passed on her way to the slab room, and that it was not a part of an attendant's duty and custom to assist bathers from the bathroom to the room where they received the salt and soap rub, "unless they were crippled and asked for my assistance". She says that while she was guiding Mrs. Elbert to the door of her tub-room, she (Mrs. Elbert) raised her elbows in a manner indicating that she did not wish to be held by the attendant. In explaining her interpretation of this movement Mrs. Warner said: "Well, in all my experience I have found most people, or practically all people who aren't crippled, resent having some one hold onto them unless they need their assistance." Finding nothing unusual in this movement Mrs. Warner says that when Mrs. Elbert had passed out of the doorway and stepped

aside, she (Mrs. Warner) went over to the slab.

At the moment of reaching the slab room Mrs. Warner heard a thudding sound in the central room, turned around and saw Mrs. Elbert on the floor. She was lying "right outside of her booth", and "on the sheet that was on the floor". She started to pick Mrs. Elbert up, found she couldn't lift her alone, and called another assistant, Mrs. Cora Emery, to aid her.

"Q. Now, when Cora came did you hear Cora ask this lady anything? A. Yes, sir.

"Q. What did Cora ask her? A. She said, 'Mrs. Elbert, did you faint?'

"Q. And what did Mrs. Elbert say? A. Mrs. Elbert said, 'I tripped on my sheet'."

Mrs. Emery, in her testimony, said that as far as she could remember there was a sheet on the floor at the point where Mrs. Elbert fell; that it was always "the customary and general practice to put the sheets down there"; that the floor was not wet. Following are excerpts from her testimony:

"Q. Now, Mrs. Emery, did you speak to Mrs. Elbert at the time? A. I did.

"Q. What did you say to her? A. I said, 'Oh, Mrs. Elbert, did you fall'?

"Q. And what did she say? A. She said, 'No, I tripped on my sheet'.

"Q. Was there anything else said there? A. I started to pick her up and she said, 'Oh, wait'.

"Q. And then what did you do? A. And Marie and I both assisted her to the cot room to a bed.

"Q. Now, Mrs. Emery, was there any water on the floor of that bathroom? A. Not to my knowledge.

"Q. Was there any occasion for any amount of water to be on the floor? A. Not in that particular place."

And again:

"Q. You always assisted them out of the tub? A. Yes, we always help them out of the tub.

"Q. They had rules to that effect, you should assist them, did you not? A. Surely, always help them out of the tub.

"Q. And the blood left their head while they were in those hot tubs, didn't it?

"Q. That is the effect it has on them? A. We always help them out of the tub, yes.

"Q. And you assisted them from the tub room over to the salt bath, did you? A. Not necessarily.

"Q. Well, generally did you? A. Not always. But if there was a cripple, just a cripple.

"Q. Just a cripple, you didn't help anybody but cripples? A. Not if they was able-bodied."

On redirect examination Mrs. Elbert testified as follows:

"Q. I want to ask you if Mrs. Cora Emery asked you on the day you were injured in this bath-house, if she ever said to you, 'Oh, Mrs. Elbert, did you fall'? or 'Did you faint?' and did you ever in reply thereto say, 'No, I tripped on my sheet'? A. I never did.

"Q. And did you trip on your sheet? A. I did not."

She had testified that the sheet came shortly below her knees, also that she had made no motion with arm or shoulder to indicate that she did not desire assistance from the attendant.

Following are the more material of the trial court's findings of fact:

"Under all of the evidence and from the physical facts, I find that she (Mrs. Elbert) slipped and fell at almost the precise spot where the attendant left her. There was some dip or decline of the floor of the main room towards the center. Her fall was on a wet, slippery floor at a place where there was no covering.

"The floor covering, when wet, was not free from the usual danger to patrons from slipping thereon. At the immediate point where plaintiff slipped and fell, there was no rubber matting or covering over the composition floor, but according to some of defendant's testimony, there was a sheet or two in the immediate vicinity. The usual custom of defendant was to provide sheets on the floor where patrons were required to walk, the reasonable inference being that this was done as a precaution to prevent slipping by patrons. When plaintiff got out of the tub her body was not dried off but the attendant merely draped a sheet around her. There was moisture flowing from her body to her feet thence to the floor, so that her own feet would wet the floor where she stepped. It does not comport with reason that the floor of a public bath room in current use by patrons could be very dry. Moisture in

the air, due to steam and evaporation of hot water inevitably precipitated more or less moisture on the cooler tile flooring.

"I find that Mrs. Elbert did not trip or stumble over the sheet which the attendant draped around her, but that her fall and consequent injuries therefrom resulted from her feet slipping from under her on a slick floor on which there was no covering at the place where she fell, and that her fall occurred almost immediately after defendant's attendant had withdrawn the support which she had immediately theretofore given her by holding onto her arm. She was injured and her injuries resulted by reason of the negligence of defendant in said respects.

"The defendant, in the operation of its bath department, knew that patrons generally, when emerging from a tub of hot water, were ordinarily weakened, enervated and usually somewhat dizzy, and less able to take precautions for their own safety at that time than they would be under ordinary circumstances, and that plaintiff was in such condition at said time.

"The danger of slipping on the floor of the main room at the time of plaintiff's injury was not obvious or glaring. * * * Her injuries were sustained almost immediately after leaving the bath tub. I find, therefore, that plaintiff was not guilty of contributory negligence and that her injuries were directly caused by negligence of defendant."

At the outset of the trial the issues were limited by the following colloquy between court and counsel:

"The Court: So there is the question of the attendant leaving or not leaving her out there, the condition of the slippery floor.

"Mr. O'Sullivan: And the omission to use runners at this time.

"The Court: As I take it, those are the issues in the case.

"Mr. Rogers: I would think so, of course.

"Mr. O'Sullivan: And the extent of her injuries.

"Mr. Rogers: I don't admit the seriousness of the injuries he stated here, but the lady did receive some injury there.

"The Court: Very well. I just mention that so that you might shorten up as far as the proof is concerned.

"Mr. Rogers: Oh, yes, they don't need to go into any history of the background. They can start there with their case."

No point was made by appellant on the character and extent of the injuries and the expense suffered, but the defense was confined to the ultimate question of liability. On this appeal the points urged may be reduced to the following: (1) The evidence failed to support the facts found and the conclusions reached, and (2) Mrs. Elbert was guilty of contributory negligence which caused her injury.

By statement and quotation we have set out those portions of the testimony which we regard as most directly bearing upon the findings made and the issues presented. With the applicable law there can be, and is, little room for difference. The real issue is whether the appellant, as the operator of this bathroom, used ordinary and reasonable care in accordance with the known perils incident to the operation of such a business; and whether it used ordinary care to keep the premises in a reasonably safe and suitable condition, so that the invited patron would not be unnecessarily or unreasonably exposed to danger. The determination of these questions involves a consideration of whether there was a duty on the part of defendant to give physical assistance to Mrs. Elbert in passing from her bath booth to the salt rub room; whether the floor traversed was wet or dry, reasonably covered to guard against slipping, and whether the situation was so open and glaring as to impose a corresponding duty and care upon the appellee herself, the neglect of which would subject her to the charge of contributing to her own injury. All these questions were considered by the trial court, sitting as a jury, and were resolved in favor of the appellees. It may freely be conceded that this is a close case, but it is to be remembered that, in all actions tried upon the facts without a jury, due regard must be given to the opportunity of the trial court to judge of the credibility of the witnesses, and that findings of fact shall not be set aside unless clearly erroneous. It is our conclusion that in the case before us there is such substantial support in the record for the findings made that we should not be justified in disturbing the conclusions of the trial judge. This necessarily results in affirmance of the judgments, and it is so ordered.